UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON CROFT,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>GTT COMMUNICATIONS, INC., et al.,<br><br>　　　　Defendants. | Case No. 21-cv-01083-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO REMAND**<br><br>Docket No. 15 |

Plaintiff Aaron Croft has sued his former employer, GTT Communications, Inc., and his former supervisor there, Eric Cohen, for employment discrimination. Mr. Croft initially filed suit in state court. GTT removed the case, arguing that there is diversity jurisdiction once the citizenship of Mr. Cohen, who was fraudulently joined, is ignored. (Both Mr. Croft and Mr. Cohen are citizens of California.) Currently pending before the Court is Mr. Croft's motion to remand. Having considered the parties' briefs and the oral argument of counsel, the Court hereby **DENIES** the motion.

## I.　　FACTUAL & PROCEDURAL BACKGROUND

A.　Complaint

In his complaint, Mr. Croft alleges as follows.

GTT is a company that provides internet service. *See* Compl. ¶ 1. Mr. Croft began to work for GTT as an Account Director in approximately May 2018. *See* Compl. ¶ 17. He was terminated on January 15, 2020. *See* Compl. ¶ 27.

Before he was terminated, Mr. Croft was performing his job well. For example, "just before his termination, [he] was instrumental in winning a new service contract with Imperva,

1    which was part of an overall larger deal." Compl. ¶ 17. In addition, in 2019, he was awarded the
2    "Hustle Ball" in recognition of "the number of new service contracts entered into with new
3    clients." Compl. ¶ 17.
4        In August or September 2019, Mr. Croft began to suffer from increased pain in his back
5    due to a degenerative disc disease. *See* Compl. ¶ 18.
6        In September or October 2019, Mr. Croft discussed with David Gilbert (whose position is
7    unspecified) the issue of his daily commute to the Pleasanton office (sixty miles each) which was
8    "causing him additional pain and exacerbating his back condition." Compl. ¶ 19. He also
9    discussed with Mr. Gilbert the issue sitting "hour upon hour" in a cubicle. Compl. ¶ 19.
10       On October 21, 2019, Mr. Croft's physician gave him a note recommending work
11   restrictions – *i.e.*, advising against a lengthy daily commute and prolonged periods of sitting time.
12   *See* Compl. ¶ 20. Mr. Croft informed Mr. Cohen, his supervisor, of the restrictions. Mr. Cohen
13   said that "the restrictions would not be a concern." Compl. ¶ 20.
14       In late October or early November, Mr. Croft's medical providers recommended surgery
15   for his back. "The surgery date was set for January 17, 2020, and [Mr.] CROFT would need to be
16   off from work for approximately four to six [w]eeks as a result." Compl. ¶ 21. Mr. Croft
17   informed both Mr. Gilbert and Mr. Cohen. Pursuant to instructions from Mr. Gilbert, Mr. Croft
18   also informed Human Resources. *See* Compl. ¶ 21. On December 2, 2019, Mr. Croft contacted
19   Human Resources to ask for the FMLA/CFRA forms for his upcoming surgery and to request
20   reasonable accommodations. *See* Compl. ¶ 22.
21       Subsequently, Mr. Croft "noticed a change in how he was being viewed as an employee,
22   and began to see his work being unfairly scrutinized." Compl. ¶ 24.
23       On January 5, 2020, Mr. Croft flew to Texas to attend GTT's Sale Kickoff Conference.
24   There was a dinner on the first night of the conference. At the dinner, Mr. Cohen, who had also
25   attended, called Mr. Croft "'weak'" at least 6 times – in front of colleagues and co-workers –
26   because he was taking time-off for surgery and requesting reasonable accommodations for his
27   back condition. *See* Compl. ¶ 26. Mr. Croft asked Mr. Cohen to have a private conversation
28   between the two of them. After the two left the dinner table, Mr. Croft told Mr. Cohen that his

1 behavior was inappropriate.  Mr. Cohen responded that he was simply "'being honest' about how

2 he felt about [Mr.] CROFT's situation" and that he "'thought it was weak that [Mr. Croft] couldn't

3 just drive to Pleasanton.'"  Compl. ¶ 25.  At the dinner the following night, Mr. Cohen

4 commended Mr. Croft in front of others, complimenting him on his work.  *See* Compl. ¶ 25.

5 After returning from the conference, Mr. Croft was asked to participate in a one-on-one

6 meeting with Mr. Cohen on the phone.  This call took place on January 15, 2020, *i.e.*, only two

7 days before Mr. Croft's scheduled surgery.

> [Mr.] COHEN asked [Mr.] CROFT about the details of all his clients, the opportunities he had and/or was actively working on, and at which phase each of the opportunities [was] currently.  [Mr.] COHEN also asked [Mr.] CROFT who he knew on a personal level at the company, and proceeded to go through a list of items found on the "Success Plan" that [Mr.] CROFT had previously gone over with Mr. Gilbert in early August of 2019.

12 Compl. ¶ 26.  In essence, Mr. Cohen was conducting a negative performance evaluation –

13 "unannounced and done in complete surprise without warning or prior notice."  Compl. ¶ 26.

14 Later the same day, Mr. Croft had another phone call with Mr. Cohen.  A Human

15 Resources representative was also present on the call.  Mr. Cohen told Mr. Croft that he was

16 terminated, effective immediately, based on his performance.  *See* Compl. ¶ 27.  The Human

17 Resources representative told Mr. Croft that his health coverage would end immediately and

18 noted, "'I understand this is not the best time for you,'" implicitly recognizing that Mr. Croft was

19 due for surgery in just 2 days.  Compl. ¶ 27.

20 The following day, the Human Resources representative contacted Mr. Croft and told him

21 that his termination date had been moved from January 15 to January 17, 2020 (*i.e.*, the day of his

22 surgery).  *See* Compl. ¶ 28.

23 On January 27, 2020, Mr. Croft wrote an email "to GTT executives and decision makers

24 Ernie Ortega, Tony Rivale, Rick Calder, Janet Reger, and Jeremy Schonzeit [the Human

25 Resources representative]," complaining about "the events that had transpired over the previous

26 five months."  Compl. ¶ 29.  Mr. Croft specifically complained about Mr. Cohen's conduct,

27 including the surprise performance review and lack of progressive discipline.  He also noted his

28 belief that he was being "unfairly target[ed] for termination due to his physical disability, request

United States District Court
Northern District of California

1  for reasonable accommodations, and request for FMLA/CFRA leave in relation to the surgery to
2  address his back condition." Compl. ¶ 29.
3        Based on, *inter alia*, the above allegations, Mr. Croft has asserted the following claims for
4  relief:
5        (1) Discrimination in violation of FEHA (*e.g.*, denying reasonable accommodations
6           and terminating him).
7        (2) Failure to accommodate and/or engage in the interactive process in violation of
8           FEHA.
9        (3) Disability-based harassment/hostile work environment in violation of FEHA.
10       (4) Failure to prevent discrimination, retaliation, and harassment/hostile work
11          environment in violation of FEHA.
12       (5) Retaliation in violation of FEHA.
13       (6) Violation of public policy (*i.e.*, a *Tameny* claim).
14       (7) Wrongful termination in violation of public policy (*i.e.*, a Tameny claim).
15       (8) Intentional infliction of emotional distress ("IIED").
16 In his pleading, Mr. Croft did not make clear which claims above were asserted against which
17 Defendant (*i.e.*, GTT, Mr. Cohen, or both). In his opposition, however, he represents that the
18 following claims have been asserted against Mr. Cohen: disability-based harassment/hostile work
19 environment and retaliation.
20 B.   Evidence Submitted in Conjunction with Notice of Removal
21       GTT removed Mr. Croft's case from state to federal court, asserting diversity jurisdiction
22 once the citizenship of Mr. Croft was disregarded.
23       In support of its removal, GTT submitted declarations that reflect as follows:
24       • GTT is a Delaware corporation with its principal place of business in Virginia. *See*
25         Docket No. 1-1 (Pless Decl. ¶ 2).
26       • "Plaintiff was compensated a base salary of $102,000 per year, plus commissions
27         when he was employed by GTT." Docket No. 1-1 (Pless Decl. ¶ 3).
28

C.      Evidence Submitted in Conjunction with Motion to Remand

As part of its opposition to the motion to remand, GTT submitted a declaration from Mr. Cohen. In his declaration, Mr. Cohen states that he did not become Mr. Croft's supervisor until January 1, 2020, *i.e.*, shortly before the sale conference and his subsequent termination. *See* Cohen Decl. ¶ 3. Mr. Cohen also states that he did not make the decision to terminate Mr. Croft. *See* Cohen Decl. ¶ 5. Finally, Mr. Cohen states that he consents to GTT's removal of the case to federal court. *See* Cohen Decl. ¶ 6.

## II.    DISCUSSION

### A.    Legal Standard

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction[] may be removed by the defendant." 28 U.S.C. § 1441(a). "Because of the 'Congressional purpose to restrict the jurisdiction of the federal courts on removal,' the [removal] statute is strictly construed, and federal jurisdiction 'must be rejected if there is any doubt as to the right of removal in the first instance.'" *Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996). The defendant has the burden of establishing that removal was proper – *i.e.*, that there is subject matter jurisdiction. *See id.*

In the instant case, GTT removed based on diversity jurisdiction. Although Mr. Croft sued a nondiverse defendant – Mr. Cohen – GTT argues that Mr. Cohen's citizenship can be ignored because he was fraudulently joined to the case.

Typically, "[i]n a fraudulent joinder claim, a diverse defendant contends that a plaintiff joined a non-diverse defendant against whom the plaintiff has no real claim in order to defeat federal [diversity] jurisdiction." *Mullin v. GM, LLC*, No. CV 15-7668-DMG (RAOx), 2016 U.S. Dist. LEXIS 2560, at *9 n.3 (C.D. Cal. Jan. 7, 2016). That being said, technically, "fraudulent joinder" is a term of art. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001). In other words, there need not be a conscious effort on the part of the plaintiff to defeat diversity jurisdiction. *See Rangel v. Bridgestone Retail Operations, LLC*, 200 F. Supp. 3d 1024, 1030 (C.D. Cal. 2016) (stating that "[f]raudulent joinder is a term of art and does not implicate a plaintiff's subjective intent"). "Joinder of a non-diverse defendant is deemed fraudulent, and the

defendant's presence in the lawsuit is ignored for purposes of determining diversity, 'if the plaintiff fails to state a cause of action against a resident defendant, *and the failure is obvious according to the settled rules of the state*.'"  *Morris*, 236 F.3d at 1067 (emphasis added); *see also Diaz v. Allstate Ins. Grp.*, 185 F.R.D. 581, 586 (C.D. Cal. 1998) (stating that, for removal, "'the defendant must demonstrate that there is no possibility that the plaintiff will be able to establish a cause of action in state court against the alleged sham defendant'") (emphasis omitted).  As explained by the Seventh Circuit, "[a]lthough false allegations of jurisdictional fact may make joinder fraudulent, in most cases fraudulent joinder involves a claim against an in-state defendant that simply has no chance of success, whatever the plaintiff's motives."  *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992).

Obviousness is critical to a fraudulent joinder assessment.  Indeed, "the inability to make the requisite decision in a summary manner itself points to the inability of the removing party to carry its burden."  *Allen v. Boeing Co.*, 784 F.3d 625, 634 (9th Cir. 2015) (internal quotation marks omitted).  If a plaintiff has a colorable claim against a nondiverse defendant, then there is no fraudulent joinder.  *See Jimenez v. Witron Integrated Logistics, Inc.*, No. CV 15-00605 DSF (PLAx), 2015 U.S. Dist. LEXIS 157444, at *3 (C.D. Cal. Nov. 20, 2015) (stating that "[t]he question is whether plaintiff has a colorable claim against the alleged sham defendants, not whether the defendants can propound defenses to the cause of action"); *see also Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1333 (11th Cir. 2011) (noting that the standard for fraudulent joinder is different from the standard applicable to a 12(b)(6) motion to dismiss; the latter requires plausibility while the former only *possibility*).

Notably, there is a "'general presumption against fraudulent joinder.'"  *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1046 (9th Cir. 2009), and "[f]raudulent joinder must be proven by clear and convincing evidence."  *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007).  Furthermore, "'all disputed questions of fact and all ambiguities in the controlling state law are [to be] resolved in plaintiff's favor.'"  *Gupta v. IBM*, No. 5:15-cv-05216-EJD, 2015 U.S. Dist. LEXIS 169088, at *5 (N.D. Cal. Dec. 16, 2015); *see also Rankankan v. JPMorgan Chase Bank, N.A.*, No. 16-cv-01694-JCS, 2016 U.S. Dist. LEXIS 81365, at *14 (N.D.

1   Cal. June 22, 2016) (stating that "'[a]ll doubts concerning the sufficiency of a cause of action

2   because of inartful, ambiguous or technically defective pleading must be resolved in favor of

3   remand, and a lack of clear precedent does not render the joinder fraudulent'"); *cf. Ritchey v.*

4   *Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998) (stating that "a defendant must have the

5   opportunity to show that the individuals joined in the action cannot be liable on any theory").

B.  Claims Against Mr. Cohen

1.  Disability-Based Harassment/Hostile Work Environment

The parties agree that a FEHA harassment claim can be brought against an individual supervisor, and not just an employer. FEHA provides that it is unlawful for "an employer . . . or any other person" to harass an employee based on, *inter alia*, physical or mental disability. *See* Cal. Gov't Code § 12940(j)(1). The statute further provides that "[a]n employee of an entity . . . is *personally* liable for any harassment prohibited by this section that is perpetrated by the employee, regardless of whether the employer or covered entity knows or should have known of the conduct and fails to take immediate and appropriate corrective action." *Id.* § 12940(j)(3) (emphasis added); *see also Lewis v. City of Benicia*, 224 Cal. App. 4th 1519, 1524, 169 Cal. Rptr. 3d 794, 801 (2014) (stating that, "[u]nder FEHA, an employee who harasses another employee may be held personally liable"; citing § 12940(j)(3) in support); *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 62-63 (1996) (noting that supervisors may be held personally liable for harassment but not discriminatory personnel decisions; the "differential treatment of harassment and discrimination is based on the fundamental distinction between harassment as a type of conduct not necessary to a supervisor's job performance, and business or personnel management decisions – which might later be considered discriminatory – as inherently necessary to performance of a supervisor's job").

The question for the Court therefore is whether it is obvious that Mr. Croft has no harassment claim based on the facts alleged in the complaint – or whether it is possible (not plausible) that he has such a claim. In the complaint, Mr. Croft asserts that Mr. Cohen engaged in the following improper conduct: (1) repeatedly calling Mr. Croft "weak" at the sales conference in front of colleagues and co-workers and (2) launching a surprise negative performance evaluation

7

1  and then firing him (on the same day).

2      As an initial matter, the Court takes note that Mr. Cohen has submitted a declaration
3  testifying that he did not make the decision to terminate Mr. Croft (as he had only been Mr.
4  Croft's supervisor for two weeks). *See* Cohen Decl. ¶ 5. But "'all disputed questions of fact . . .
5  are [to be] resolved in plaintiff's favor.'" *Gupta v. IBM*, No. 5:15-cv-05216-EJD, 2015 U.S. Dist.
6  LEXIS 169088, at *5 (N.D. Cal. Dec. 16, 2015). The Court therefore does not give Mr. Cohen's
7  declaration any consideration at this time.

8      That being said, there is an issue as to whether Mr. Croft's termination can even be
9  considered harassment in the first place. FEHA has separate provisions for discrimination and
10 harassment. *Compare* Cal. Gov't Code § 12940(a) (making it unlawful for an employer to refuse
11 to hire, to terminate, or to discriminate against a person "in compensation or in terms, conditions,
12 or privileges of employment" based on, *inter alia*, physical or mental disability), *with id.* §
13 12940(j)(1), (3) (addressing harassment based on, *inter alia*, physical or mental disability). In
14 *Roby v. McKesson Corp.*, 47 Cal. 4th 686 (2009), the California Supreme Court explained the
15 distinction between discrimination and harassment as follows.

> FEHA's discrimination provision addresses only *explicit* changes in the "terms, conditions, or privileges of employment"; that is, changes involving some *official action taken by the employer*. In the case of an institutional or corporate employer, the *institution or corporation itself* must have taken some official action with respect to the employee, such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action.
>
> By contrast, harassment often does not involve any official exercise of delegated power on behalf of the employer. . . . Thus, harassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee.

24 *Id.* at 706 (emphasis in original). "In short, "harassment is generally concerned with the *message*
25 conveyed to an employee, and therefore with the social environment of the workplace, whereas
26 discrimination is concerned with explicit changes in the terms or conditions of employment." *Id.*
27 at 708 (emphasis in original).

28     The *Roby* Court, however, reversed the lower appellate court's determination that there

8

was insufficient evidence to support the jury's harassment verdict – essentially because the lower court put too much stock into a statement in an earlier California Supreme Court decision that "commonly necessary personnel management actions . . . do not come within the meaning of harassment." *Id.* at 700 (internal quotation marks omitted).

> The Court of Appeal viewed that statement as indicating a sharp distinction that not only placed discrimination and harassment claims into separate legal categories but also barred a plaintiff from using personnel management actions as evidence in support of a harassment claim. The Court of Appeal therefore disregarded every act of defendants that could be characterized as personnel management, and, looking only at the remaining evidence, the court found it insufficient to support the jury's harassment finding.

*Id.* at 700-01.

The *Roby* Court explained that this approach was incorrect because, "in some cases the hostile message that constitutes the harassment is conveyed through official employment actions, and therefore evidence that would otherwise be associated with a discrimination claim can form the basis of a harassment claim." *Id.* at 708 (emphasis omitted; adding that, "in analyzing the sufficiency of evidence in support of a harassment claim, there is no basis for excluding evidence of biased personnel management actions so long as that evidence is relevant to prove the communication of a hostile message").

In the case before it (a disability-based harassment case), the *Roby* Court noted that some of the supervisor's actions could not be "fairly . . . characterized as an official employment action"; this included

> Schoener's demeaning comments to Roby about her body odor and arm sores, Schoener's refusal to respond to Roby's greetings, Schoener's demeaning facial expressions and gestures toward Roby, and Schoener's disparate treatment of Roby in handing out small gifts. None of these events . . . involved Schoener's exercising the authority that McKesson had delegated to her . . . .

*Id.* at 709. But

> some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message. This occurs when the actions establish a widespread pattern of bias. Here, some actions that Schoener took with respect to Roby are best characterized as official

> employment actions rather than hostile social interactions in the workplace, but they may have contributed to the hostile message that Schoener was expressing to Roby in other, more explicit ways. These would include Schoener's shunning of Roby during staff meetings, Schoener's belittling of Roby's job, and Schoener's reprimands of Roby in front of Roby's coworkers.

*Id.*

The *Roby* Court thus found that the lower court erred in "ignoring the discrimination evidence when analyzing the harassment verdict . . . . [T]he FEHA treats discrimination and harassment as distinct categories, but nothing in the FEHA requires that the evidence in a case be dedicated to one or the other claim but never to both." *Id.* at 710.

In light of *Roby*, an act of termination could, in theory, be not only discrimination under FEHA but also constitute evidence of harassment under FEHA. The problem for Mr. Croft is that, per *Roby*, official employment actions communicate a hostile message when "when the actions establish *a widespread pattern of bias*." *Id.* at 709 (emphasis added). Here, it is obvious that Mr. Croft has not alleged a widespread pattern even when taking into account the act of his termination. As evidence of harassment, Mr. Croft has simply pointed to two acts: (1) Mr. Cohen repeatedly calling him "weak" on one occasion – the sales conference in January, and (2) his termination 10 days later. *Compare, e.g.*, *Quigley v. United Airlines, Inc.*, No. 3:21-cv-00538-WHO, 2021 U.S. Dist. LEXIS 59745, at *26 (N.D. Cal. Mar. 29, 2021) (noting that, for plaintiff's harassment claim, "he would need to plead sufficiently pervasive bias that led to a hostile message, which the termination and mistakes on the insurance forms do not plausibly show"), *with Schaldach v. Dignity Health*, No. 2:12-cv-02492-MCE-KJN, 2013 U.S. Dist. LEXIS 173537, at *17 (E.D. Cal. Dec. 6, 2013) (holding that plaintiff plausibly alleged harassment because, as alleged, defendants "engaged in a pattern of discriminatory actions which sent a message to the work force that older employees were not valued and would be systematically replaced by younger workers[;] [t]his pattern started with the message from the President to supervisors to hire 'young,' 'cute,' and 'perky' employees, and continued with the systematic efforts to terminate older employees and replace them with young people").

This Court addressed the necessity of a pattern of harassment in *Pichon v. Hertz Corp.*, No. 17-cv-02391-EMC, 2017 U.S. Dist. LEXIS 119121 (N.D. Cal. July 28, 2017):

> In order to have a viable age harassment claim, a plaintiff must show that the "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 703 (N.D. Cal. 2014). "With respect to the pervasiveness of harassment, courts have held that an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature." *Lyle v. Warner Bros. Televis. Prods.*, 38 Cal. 4th 264, 283 (2006). Thus, "when the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a claim based on working conditions." *Id.* at 284. In *Hughes v. Pair*, 46 Cal. 4th 1035 (2009), the California Supreme Court held that the plaintiff had failed to plead pervasive sexual harassment because "the alleged sexual harassment consisted only of comments defendant made to plaintiff during a single telephone conversation and a brief statement defendant made to plaintiff in person later that day during a social event at a museum." *Id.* at 1048.
>
> In the instant case, Mr. Pichon does not make any real contention that the alleged age harassment was severe; rather, he takes the position that the harassment was pervasive. The problem for Mr. Pichon is that he has simply pointed to a handful of comments made by Mr. Chua – and this is so even when the Court includes the comments allegedly made by Mr. Chua as stated in the Cole declaration (that Defendants have asked the Court to strike). Mr. Chua directed only two comments at Mr. Pichon; in essence, the comments merely inquired or assumed that he would retire soon. Mr. Chua did make one disparaging comment within Mr. Pichon's earshot about the age of other workers who were in an entirely different job which evidently involved some physicality. But Mr. Pichon has failed to cite any authority to support his position that a handful of comments (particularly of the kind here) constitutes severe or pervasive harassment sufficient to create a hostile working environment. Thus, Mr. Pichon has alleged neither a plausible or possible claim of a hostile working environment based on age. Moreover, Mr. Pichon has failed to demonstrate that he could plead additional factual allegations to support either a severe or pervasive harassment theory. His submission of the Cole declaration was an attempt to give more factual support but, as noted above, even when that evidence is taken into account, that adds little, if anything, to the claim of a hostile work environment. It is obvious that, under California law, Mr. Pichon's age harassment claim is not viable.

*Id.* at *13-15. There is no pervasive pattern of harassment here.

    2.    <u>Retaliation</u>

Mr. Croft also brings a FEHA retaliation claim against Mr. Cohen. According to Defendants, this claim obviously fails because (1) simply making a request for accommodation is not protected activity and (2) the only protected activity that Mr. Cohen did engage in – *i.e.*,

11

complaining about disability discrimination in an email dated January 27, 2020 – took place *after* he had been already been terminated.

Defendants' arguments are problematic for two reasons.

- First, FEHA does provide that retaliation against a person for requesting accommodation is unlawful. *See* Cal. Gov't Code § 12940(l)(4) (providing that it is unlawful "[f]or an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted"). *Compare id.* § 12940(h) (providing that it is unlawful "[f]or any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part"). Defendants' reliance on *Rope v. Auto-Chlor System of Washington, Inc.*, 220 Cal. App. 4th 635, 652 (2013) ("find[ing] no support in the regulations or case law for the proposition that a mere request – or even repeated requests – for an accommodation, without more, constitutes a protected activity sufficient to support a claim for retaliation in violation of FEHA"), is unavailing because it was decided in 2013 and, in 2015, the California legislature amended § 12940 by adding, *inter alia*, subdivision (l)(4) cited above. *See Moore v. Regents of Univ. of Cal.*, 248 Cal. App. 4th 216, 245 (2016).
- Second, arguably, Mr. Croft engaged in "traditional" protected activity before his termination because, at the sales conference, Mr. Croft asked to speak to Mr. Cohen privately and told Mr. Cohen that "calling him 'weak' was inappropriate." Compl. ¶ 25.

That being said, there is a more fundamental problem with Mr. Croft's retaliation claim. That is, supervisors cannot be held individually liable for retaliation under FEHA. In *Jones v. Lodge at Torrey Pines Partnership*, 42 Cal. 4th 1158 (2008), the California Supreme Court held:

12

> All of these reasons for not imposing individual liability for discrimination – supervisors can avoid harassment but cannot avoid personnel decisions, it is incongruous to exempt small employers but to hold individual nonemployers liable, sound policy favors avoiding conflicts of interest and the chilling of effective management, corporate employment decisions are often collective, and it is bad policy to subject supervisors to the threat of a lawsuit every time they make a personnel decision – apply equally to retaliation.

*Id.* at 1167. Notably, the *Jones* Court recognized that § 12940(h), the main retaliation provision, provided that it is unlawful for a "person" to retaliate but stated that, "[i]n context, the Legislature may have used the word 'person' in subdivision (h) for reasons unrelated to a desire to make individuals personally liable for retaliation." *Id.* at 1163.

C.     Amount in Controversy

Mr. Croft argues that, even if he obviously has no claims against Mr. Cohen, there is diversity jurisdiction over his claims against GTT only if the amount in controversy exceeds $75,000 and GTT has failed to establish such.

> Where, as here, it is unclear from the face of the complaint whether the amount in controversy exceeds $75,000, "the removing defendant bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds the jurisdictional threshold." The amount in controversy may include "damages (compensatory, punitive, or otherwise) and the cost of complying with an injunction, as well as attorneys' fees awarded under fee shifting statutes." "Conclusory allegations as to the amount in controversy are insufficient." In assessing the amount in controversy, we may consider allegations in the complaint and in the notice of removal, as well as summary-judgment-type evidence relevant to the amount in controversy.

*Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 416 (9th Cir. 2018); *see also Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) (noting that "we have endorsed the Fifth Circuit's practice of considering facts presented in the removal petition as well as any 'summary-judgement-type evidence relevant to the amount in controversy at the time of removal'"). "Where doubt regarding the right to removal exists, a case should be remanded to state court." *Id.*

In the instant case, Mr. Croft has not identified how much he seeks in damages but does identify the categories of damages sought, such as compensatory damages, emotional distress

13

1  damages, medical expenses, punitive damages, and attorney's fees. *See* Compl. (prayer for relief).

2  GTT contends that Mr. Croft easily exceeds the $75,000 threshold given these categories:

> Plaintiff was compensated a base salary of $102,000 per year, plus commissions, when he was employed by GTT. Based on the prayer and the amount Plaintiff was earning pre-termination, GTT estimates that Plaintiff is attempting to seek well over $75,000 in compensatory damages, as well as additional punitive damages and attorneys' fees (as permitted under the FEHA). The total potential amount in controversy, exclusive of attorneys' fees and costs and potential punitive damages, is approximately $150,000, which exceeds $75,000. Plaintiff was terminated in mid-January 2020. His potential damages for back pay alone, based on his annual salary of $102,000 are $119,000, excluding commissions ($8,500 base salary per month x 14 months since termination). The amount in controversy will exceed $180,000 should punitive damages be taken into account.

Opp'n at 9; *see also* Docket No. 1-1 (Pless Decl. ¶ 3) (testifying that Mr. Croft had a base salary of $102,000 per year, plus commissions, while at GTT).

In his reply brief, Mr. Croft argues that he would not get back pay of $119,000 because (1) he "would have no expectation to recover damages for [lost] pay for the six-weeks of unpaid time-off to recovery [from] his surgery in early 2020" and (2) he would have no expectation to recovery damages once he secured replacement employment, which he did "around September 2020." Reply at 2. According to Mr. Croft, back pay would cover at most the period from March 2020 through August 2020, which is 6 months, and 6 months with a $8,500 base salary would amount to $51,000. *See* Reply at 2 (arguing that "applying appropriate offsets . . . , it is not unlikely that arguments for damages more akin to half a year's salary . . . would be made").

But there are problems with Mr. Croft's arguments. First, he has not provided any "summary judgment-type evidence" showing that he secured replacement employment in September 2020. Second, even if he could only get back pay for a 6 month period, he is still seeking medical expenses, punitive damages, and attorneys' fees. These additional categories more than likely get him over the $75,000 threshold, especially as GTT's burden here is only preponderance of the evidence. In this regard, the Court takes note that Mr. Croft's counsel charges $450 per hour and, at least at one point, asked to be compensated $9,900 for bringing the

14

motion to remand.[1]  *See* Fordiani Decl. ¶ 6 (testifying that he spent 16.5 hours on the opening brief and expects to spend 4 hours to review the opposition and prepare the reply and 0.5 hour to attend the hearing).  Given this, fees for prosecuting this case to conclusion could easily push the total amount in controversy to $75,000.

### III.   CONCLUSION

For the foregoing reasons, the Court denies Mr. Croft's motion to remand.  Mr. Cohen was fraudulently joined to the lawsuit and therefore his citizenship can be disregarded.  There is complete diversity between Mr. Croft and GTT, and GTT has shown by a preponderance of the evidence that the amount in controversy exceeds $75,000.

This order disposes of Docket No. 15.

**IT IS SO ORDERED**.

Dated: May 10, 2021

_____
EDWARD M. CHEN
United States District Judge

---

[1] At the hearing, counsel indicated that he was withdrawing the fee request.